UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------

CHERYL D. BROWN,

Plaintiff,

—against—

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant,

--------------------------------------------------------

**MEMORANDUM AND ORDER**

08-CV-4245 (SLT)

**TOWNES, United States District Judge:**

Cheryl D. Brown ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a final decision of Defendant Michael Astrue, Commissioner of Social Security ("the Commissioner"), which held that Plaintiff was eligible for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("the Act"), but only as of December 21, 2007. The Commissioner now moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and Plaintiff cross-moves under that provision, claiming that she was entitled to DIB and SSI as of November 24, 2003, and seeking an order remanding this case to the Commissioner solely for calculation of benefits. For the reasons set forth below, the Commissioner's motion is denied and Plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner, but not for the purpose of calculation of benefits, but rather for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiff was born in 1963. Admin. R. ("A.R.") at 334. She graduated high school and obtained an associate's degree in computers. *Id.* at 337. Plaintiff's earnings record shows she worked in 1983 and from 1985 through 2003. *Id.* at 77. In her disability report, Plaintiff indicated she has previously worked as a receptionist, detail assistant for a jeweler, auditor for an

accounting firm, babysitter, and a salesperson. *Id.* at 86. At her administrative hearing, Plaintiff described her past work as clerical and data entry work. *Id.* at 340-41. She last worked as a babysitter in 2003. *Id.* at 344-45.

Although Plaintiff testified that she stopped working in 2003 because she "started having problems . . . walking" due to pain and swelling in her legs, *id.* at 345-46, the administrative record contains evidence that she initially sought medical treatment for leg-related problems in May 2001. On May 1, 2001, Plaintiff visited the emergency room at St. John's Episcopal Hospital ("SJH"), complaining that she had been awakened by severe pain in her right leg, extending from her hip to her feet. *Id.* at 224. Emergency room doctors apparently suspected some form of nerve involvement, but an X-ray of Plaintiff's lumbosacral spine proved unremarkable. *Id.* at 184.

One week later, when Plaintiff presented for a follow-up examination at the SJH orthopedic clinic, she was no longer in acute distress. *Id.* at 224. She reported "funny sensations" and some "weakness" in both legs, but was walking normally. *Id.* On examination, Plaintiff had some tenderness in the back of her right leg and pain upon manipulation of her right hip. *Id.* However, she had good range of motion in both legs. *Id.*

There is some indication in the record that Plaintiff continued to complain of pain in both her legs in the two years before she stopped working in November 2003. A document from South Shore Imaging Services at SJH indicates Plaintiff had a history of swelling in the right foot and ankle by July 7, 2003, and had X-rays of her right foot and ankle taken on that date. *Id.* at 185. However, apart from that radiological report, which indicated that the X-rays were unremarkable, there are no records for the period between May 2001 and July 2004. *Id.*

2

Between July 14, 2004 and January 12, 2005, Plaintiff was treated at Brookdale University Hospital and Medical Center ("Brookdale Hospital") on an almost biweekly basis. A number of these visits – namely, those that occurred on July 23, October 6, and December 8, 2004, and January 12, 2005 – related to an eye condition that culminated in a diagnosis of conjunctivitis. *Id.* at 115, 117, 123, 127. As the parties do not dispute that Plaintiff's eye condition does not form a basis of her disability claim, this Court will not summarize the medical records relating to these four visits, but will instead focus on the other six visits.

The earliest medical records from Brookdale Hospital relate to Plaintiff's July 14, 2004 visit to the podiatry clinic. Plaintiff complained that she had been suffering from foot and leg pain for two or three months and that her legs were swollen. *Id.* at 125. Plaintiff was referred to Brookdale Hospital's vascular clinic. *Id.*

On August 4, 2004, Plaintiff was treated in Brookdale Hospital's cardiology clinic. She complained that, on approximately a bimonthly basis over the previous three to four months, she experienced intermittent chest pains, accompanied by a shortness of breath and lasting about five minutes. *Id.* at 126. She was referred for a stress test and echocardiogram. *Id.* Plaintiff underwent both examinations two weeks later and the results were negative. *Id.* at 128-29. Plaintiff continued to suffer chest pains a few times a month thereafter. *Id.* at 121. The cause of these pains was never determined, but was considered unlikely to be of cardiac origin. *Id.* Although the cardiology clinic's records indicate that Plaintiff was only able to walk three or four blocks at a time in August 2004, *id.* at 126, it is unclear whether that limitation was due to her chest pain or due to pain in her lower extremities, which continued unabated. A chest X-ray taken on December 8, 2004, was negative. *Id.* at 117-18.

On September 9, 2004, and October 14, 2004, Plaintiff visited the Brookdale Hospital neurology clinic with complaints of left leg pain that radiated to the calf and thigh, but was most severe in her ankle. *Id.* at 122. She reported suffering such pain for the preceding ten months. *Id.* Strength and sensory examinations did not reveal any abnormalities. *Id.* However, she returned to the neurology clinic on December 21, 2004, complaining of severe intermittent pain in her lower extremities that radiated into her ankle. *Id.* at 116. Plaintiff was referred back to her primary care physician. *Id.*

Plaintiff was treated at the SJH podiatry clinic on June 3, 2005, for complaints of pain in the ankle, toes, and ball of her right foot. *Id.* at 225. Plaintiff experienced pain in the plantar metatarsal heads in her right foot upon manipulation. *Id.* The doctor suspected she had tarsal tunnel syndrome and/or nerve impingement and ordered an X-ray and other tests. *Id.* An X-ray taken on July 7, 2005, revealed mild degenerative changes on the right first metatarsal phalangeal joint with joint narrowing and hypertrophic change giving rise to a "suspicion of tarsal coalition of the left foot[.]" *Id.* at 186. Results from a July 11, 2005, nerve conduction velocity ("NCV") study and electromyleography ("EMG") were suggestive of bilateral tarsal tunnel syndrome. *Id.* at 269-70.

Plaintiff was treated at the SJH podiatry clinic again on August 8, 2005, for complaints of bilateral foot pain. *Id.* at 225A-226. She experienced pain upon manipulation and movement of her feet and intermittent pain while at rest. *Id.* She also exhibited a decreased range of motion. *Id.* The doctor diagnosed Plaintiff as having bilateral bursitis and, perhaps, bilateral tarsal coalition. *Id.* Plaintiff was referred for a magnetic resonance imaging ("MRI") of both feet to verify the diagnosis. *Id.* at 226. An MRI of Plaintiff's left foot taken two days later revealed

4

minimal edema of the anterior fibulotalar ligament, suggesting a sprain. *Id.* at 279. The results of an MRI of Plaintiff's right ankle were unremarkable. *Id.* at 280.

Three weeks later, Plaintiff presented at the SJH podiatry clinic with complaints of bilateral ankle pain. *Id.* at 228. She was diagnosed with tarsal tunnel syndrome in the right foot. *Id.* Plaintiff was prescribed Arthrotec and injected with Marcaine and Lidocaine. *Id.* at 229. During a September 6, 2005, visit at the podiatry clinic, Plaintiff exhibited pain in the medial plantar aspect of the heel and pain over the central portion of the top of her left foot. *Id.* at 230. She was diagnosed with osteoarthritis and plantar fasciitis in the left foot. *Id.* She was advised to continue taking Arthrotec and receiving injections of Marcaine and Lidocaine. *Id.*

On October 24, 2005, Plaintiff reported that the injections provided only minimal relief. *Id.* at 232. She experienced pain upon movement of her legs, with greater severity in her left foot. *Id.* She was diagnosed with tarsal tunnel syndrome and advised to undergo physical therapy. *Id.* Plaintiff began physical rehabilitation in November 2005. *Id.* at 151.

On December 8, 2005, Plaintiff again visited the podiatry clinic with complaints of bilateral foot pain, with greater pain in her right foot. *Id.* at 236. The chart entry for that date noted that Plaintiff was obese and had recently been diagnosed with non-insulin dependent diabetes mellitus. *Id.* She was diagnosed with neuropathy. *Id.*

Plaintiff applied for DIB and SSI on January 3, 2006, alleging she had tarsal tunnel syndrome and had been unable to work since November 24, 2003, due to foot and ankle pain. *Id.* at 12, 85. On January 26, 2006, Plaintiff underwent a consultative examination by Dr. Jerome Caiati. *Id.* at 138-43. Dr. Caiati noted Plaintiff was not in acute distress and had a normal gait, yet had mild difficulty walking heels and toes. *Id.* Neurological testing was normal and X-rays of Plaintiff's left foot were unremarkable. *Id.* at 143. Dr. Caiati diagnosed Plaintiff

as having, *inter alia*, decreased flexion of the knee of undetermined etiology, obesity, hypertension, diabetes, blurred vision of undetermined etiology, hyperlipidemia and right foot plantar fasciitis. *Id.* at 141. Nonetheless, Dr. Caiati found that Plaintiff could sit, stand, walk, push, pull, lift, reach, climb, and bend without any limitations. *Id.*

Plaintiff's initial application for DIB and SSI was denied and she requested an administrative hearing on March 17, 2006. *Id.* at 40. On June 6, 2006, Plaintiff retained counsel, Binder & Binder, to represent her.

On February 27, 2006, Plaintiff was evaluated at the SJH neurology clinic for bilateral foot pain. *Id.* at 153-54. Plaintiff complained of an unpleasant sensation in the soles of her feet, stabbing pains in both feet, balance problems, and generalized weakness at times. *Id.* at 154. Plaintiff was diagnosed with polyneuropathy and questionable plantar fasciitis, as opposed to bilateral tarsal tunnel syndrome. *Id.* at 153. She was advised to follow up with a podiatrist. *Id.* Blood tests performed on the same date were negative for rheumatoid arthritis and antinuclear antibodies. *Id.* at 265, 272-73.

At a March 1, 2006, physical therapy session, Plaintiff reported an improvement in range of motion and a decrease in pain. *Id.* at 151. During this session, Plaintiff, who had been limping, exhibited full range of motion in her hips and knees. *Id.* She was discharged from physical therapy and advised to follow up with the podiatry clinic. *Id.*

The next day, however, Plaintiff complained of foot tingling and arm weakness at the SJH podiatry clinic. *Id.* at 239. Plaintiff underwent an NCV study of both lower extremities and her right upper extremity on March 16, 2006. *Id.* at 266-67. The study was consistent with mild right tarsal tunnel syndrome but revealed no evidence of peripheral neuropathy. *Id.* at 267. The radiologist recommended a "needle EMG to rule out lumbar radiculopathy." *Id.*

Six months later, on September 21, 2006, the SJH podiatry clinic listed Plaintiff's diagnoses as diabetes mellitus, neuropathy, and onychomycosis.[1] *Id*. at 243. Plaintiff underwent a needle EMG on October 23, 2006, which showed "denervation in multiple paraspinal muscles" consistent with polyradiculopathy in Plaintiff's lower extremities. *Id*. at 210-11. The radiologist theorized that these findings were probably due to diabetes. *Id*.

Plaintiff was evaluated at the SJH neurology clinic for complaints of pain in her feet on November 6, 2006. *Id*. 249. She was diagnosed with tarsal tunnel syndrome and radiculitis. *Id*. She was examined again on January 5, 2007, at SJH and her spine and tissue around her spine were found to be normal. *Id*. at 284.

However, a February 14, 2007, MRI of Plaintiff's cervical spine, taken at Peninsula Hospital Center ("PHC"), revealed significant C3-4, C4-5, and C5-6 disc degeneration with spondylosis – also known as spinal osteoarthritis – anteriorly and posteriorly. *Id*. at 181. Drs. Sprecher and Steinberg, who took Plaintiff's MRI, opined that the posterior spondylosis and posterior disc protrusions created spinal stenosis[2] and cord impingement at C3-4, C4-5, and C5-6. *Id*. The report also indicated reversal of lordosis consistent with muscle spasm. *Id*.

On April 19, 2007, Plaintiff was evaluated at PHC's orthopedic clinic for complaints of numbness, weakness, shooting pain in both arms, neck pain and a headache. *Id*. at 182. The doctor reviewed her February 14, 2007, MRI and diagnosed spinal stenosis at C3-4, C4-5, and C5-6. *Id*. She was referred to neurosurgery and prescribed Naprosyn (a/k/a naproxen) – a non-steroidal anti-inflammatory drug used to treat pain and inflammation. *Id*.

---

[1] Onychomycosis is a fungal infection that affects the toenails. *See* http://www.emedicinehealth. com/onychomycosis/article_em.htm.

[2] Spinal stenosis is a narrowing of an area of the spine. This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression. *See* http://www.mayoclinic.com/health/ spinal-stenosis/DS00515.

On April 27, 2007, Plaintiff's primary care physician, Dr. Emmanuel Decade, completed

a diabetes mellitus impairment questionnaire. *Id.* at 175-80. Although Dr. Decade indicated he

treated Plaintiff on a monthly basis since April 20, 2005, *id.* at 175, the record does not contain

Dr. Decade's chart. Indeed, the only documents authored by Dr. Decade that are contained in

the administrative record are the diabetes questionnaire and two letters that Dr. Decade wrote in

May 21, 2007, and June 4, 2007.

In the questionnaire, Dr. Decade indicated clinical findings include muscle weakness

secondary to a herniated disc, difficulty walking, dizziness/loss of balance, hyper/hypoglycemic

attacks, and fatigue. *Id.* at 175-76. Although he diagnosed Plaintiff with type 2 diabetes, he

reported that Plaintiff's diabetes was well-controlled by oral medication. *Id.* at 177. Rather, Dr.

Decade opined that Plaintiff's primary symptom was severe back pain with neuropathy. *Id.* at

176. He further reported that Plaintiff had vascular and neuropathic complications of the lower

extremities related to diabetic neuropathy. *Id.* at 177.

Dr. Decade opined that in an eight-hour workday, Plaintiff could sit for one hour, and

stand and/or walk for one hour. *Id.* at 178. After sitting for an hour, Plaintiff would have to get

up and move around another hour before sitting again. *Id.* According to Dr. Decade, Plaintiff

could frequently lift and carry up to five pounds but could not lift more than that weight without

risking further injury to her back. *Id.* at 178-79. For that same reason, Plaintiff had to avoid

kneeling, pushing, pulling, stooping, and bending. *Id.* at 180.

Dr. Decade believed Plaintiff was incapable of even low stress, and that Plaintiff's pain,

fatigue, or other symptoms would frequently interfere with her attention and concentration. *Id.*

at 179. He estimated she would be absent from work an average of three times a week as a result

of her impairments or treatment. *Id.* The doctor indicated that these limitations applied as of

April 27, 2007, and that her impairments would likely last at least twelve months, noting that she was under evaluation for spine surgery. *Id.* at 179-80.

Dr. Decade repeated his assessment of Plaintiff's limitations in letters dated May 21 and June 4, 2007. In the former, Dr. Decade stated that Plaintiff was to refrain from heavy lifting and pushing to avoid further damage to her spine. *Id.* at 197. He stated that she had a severe herniated disc of the cervical spine that was under evaluation by neurosurgery, and she could not return to work until after that evaluation and medical clearance. *Id.* In the June 4, 2007, letter, Dr. Decade stated Plaintiff had been diagnosed with severely degenerated discs with posterior disc protrusion in the cervical spine at levels three, four, five, and six. *Id.* at 188. He stated she was still under evaluation and treatment for spinal stenosis and would remain disabled until after evaluation and treatment. *Id.*

On June 31, 2007, Plaintiff was evaluated at the neurology clinic in Jamaica Hospital Medical Center ("JMC") for pain in the cervical spine. *Id.* at 308-09. However, doctors suspected that she might also have lumbosacral degenerative disc disease. *Id.* On August 15, 2007, an MRI of the lumbar spine revealed a small left paracentral disc protrusion at L4-5 superimposed on a diffuse disc bulge, which resulted in mild to moderate spinal canal narrowing and narrowing of the lateral recesses and neural foramina. *Id.* at 295. A mass effect on the left L5 nerve root was noted as well. *Id.*

Administrative Law Judge Marilyn P. Hoppenfeld (the "ALJ") held an administrative hearing on August 22, 2007, which Plaintiff and her counsel attended. At that hearing, Plaintiff testified she lived with her unemployed husband, daughter (then 20 years old), and son (then 18 years old). *Id.* at 332. She had been determined to be partially disabled for the purposes of

9

public assistance, *id.* at 372, and her family had received public assistance since 2003. *Id.* at 351-52.

During the hearing, Plaintiff named or alluded to medical professionals and centers whose records did not appear in the administrative record. The only doctor Plaintiff specifically named was her primary care physician, Dr. Emmanuel Decade, who had diagnosed her with type 2 diabetes and, according to Plaintiff, continued to see her six to eight times a month. *Id.* at 350-51. However, while a letter in the record, *id.* at 195, indicates that Plaintiff's counsel may have provided the ALJ with Dr. Decade's records from June 7, 2006, through June, 4, 2007, it is unclear whether these documents were included in the Administrative Record filed with this Court. As previously noted, the Administrative Record contains only Dr. Decade's diabetes questionnaire and letters dated May 21 and June 4, 2007. Moreover, even assuming that these were the only records pertaining to Plaintiff's case which Dr. Decade authored between June 7, 2006, and June 4, 2007, the diabetes questionnaire states that Dr. Decade began treating Plaintiff in April 2005. *Id.* at 195. There is no indication that the ALJ made any effort to obtain Plaintiff's complete medical file from Dr. Decade.

At her hearing, Plaintiff testified that she was still experiencing swelling of the ankles and legs more than once a week, and had had trouble sleeping the night before the hearing because of intense pain in her hands and wrists. *Id.* at 379. As a result of her condition, Plaintiff spent six hours during each day lying down. *Id.* at 379-80. Her husband and children performed most of the household chores, including cleaning, laundry, and shopping. *Id.* at 369. While Plaintiff was able to ride the bus, she testified that she could do so only if someone drove her to the bus stop and waited for the bus with her. *Id.* at 368.

Subsequent to the hearing, the ALJ referred Plaintiff for a consultative neurological examination and issued subpoenas for records from SJH and JMC. *Id.* at 12, 311-14, 383. On December 21, 2007, Dr. David Finkelstein, a neurologist, examined Plaintiff pursuant to the ALJ's request. *Id.* at 311-14. Dr. Finkelstein observed that Plaintiff appeared to be in acute distress from pain and had a wide-based, slow, and staggering gait. *Id.* She was unable to walk on heels and toes, used a cane for balance and had abnormal tandem walking. *Id.* She had normal cervical, thoracic, and lumbar range of motion, except that her lumbar flexion was limited to 45 degrees. *Id.* Plaintiff's neck and lower back were tender but no muscle spasm was present. *Id.* Dr. Finkelstein diagnosed Plaintiff with "diabetic neuropathy, neck pain from degenerative discs, low back pain from degenerative discs, and hypertension." *Id.* at 314. Dr. Finkelstein opined

> [Plaintiff]'s neuropathy pain, neck pain, and low back pain may limit the ability to sustain activities. There is some mild to moderate limitations in ambulation. [Plaintiff] has elevated blood pressure and agrees to let her primary care [physician] know.

*Id.*

### The ALJ's Decision

On April 10, 2008, the ALJ issued a written decision, finding that Plaintiff was disabled but only as of December 21, 2007. *Id.* 8-27. The ALJ found that Plaintiff had not engaged in substantial gainful activity since November 24, 2003, the alleged onset date. *Id.* at 16. She found Plaintiff had several impairments, including hypertension, tarsal coalition of the left foot, plantar warts, and osteoarthritis. *Id.* Additionally, the ALJ found that Plaintiff suffered from diabetes, with possible neuropathy, and cervical and lumbar degenerative disc disease since December 8, 2005. *Id.* However, the ALJ determined that Plaintiff's impairments did not meet

the requirements of any listed impairment or combination of listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I ("Appendix I"), because the medical evidence showed "there was no significant loss of strength of the extremities[,] . . . no muscle atrophy[,] . . . no muscle spasm was elicited[, and] [t]here are no complications secondary to hypertension." *Id.*

Despite Dr. Finkelstein's non-specific description of Plaintiff's impairments, the ALJ concluded that prior to December 21, 2007, Plaintiff was capable of standing and walking for two hours in an eight hour day, sitting for six hours and lifting ten pounds occasionally. *Id.* The ALJ found Plaintiff was not disabled prior to December 21, 2007, because her alleged symptoms and statements concerning the intensity, persistence, and limiting effects of those symptoms were not supported by the medical record. *Id.* at 24. She found that, prior to December 21, 2007, Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a),[3] including performing her past work as a data entry clerk, which is sedentary in exertional level. *Id.* at 25. However, the ALJ concluded that Plaintiff had become disabled under the Act as of December 21, 2007, finding that Plaintiff was no longer "capable of work activity on an eight hour basis, five days a week [and] would have difficulty ambulating for two hours in an eight hour day and lifting ten pounds." A.R. at 24.

The ALJ accorded the opinion of Dr. Decade, Plaintiff's treating physician, little weight, asserting that "it was not supported by any significant neurological findings, objective testing or

---

[3] Pursuant to 20 C.F.R. §§ 416.967(a) and 404.1567(a), "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

degrees of . . . limitation[] and [it] was based solely upon [Plaintiff's] complaints." *Id.* at 21. Although the administrative transcript contained virtually no records from Dr. Decade, the ALJ stated that Dr. Decade's diagnoses of diabetic neuropathy and a herniated disc in April 2007 were not supported by Plaintiff's medical records prior to December 2007. *Id.* at 21, 25. Specifically, the ALJ wrote, "although the wor[d] neuropathy has been utilized in this record, [Plaintiff's] oral medication remained the same, she never was required to take insulin and there were no laboratory tests showing th[at] glucose levels . . . were not within . . . normal limits." *Id.* at 21. The ALJ also noted that while Dr. Decade's questionnaire covered a period of three years, it did not specifically set forth the findings in each year and did not reflect Plaintiff's blood pressure and glucose readings. *Id.* The ALJ also discounted Plaintiff's subjective complaints, stating, "[i]n terms of the claimant's alleged symptoms prior to December 8, 2005, her allegations of pain and inability to function were not consistent with the treatment she received, the medical findings, especially the negative neurological findings, and was not limited to the extent she alleged." A.R. at 24.

After the Appeals Council denied Plaintiff's request for review on April 28, 2008, the ALJ's decision became final. *Id.* at 3-5. Plaintiff commenced this action on October 20, 2008, and both parties filed cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. Proc. 12(c).

## DISCUSSION

### I.  Scope of Review

Judicial review of SSI benefit determinations is governed by 42 U.S.C. § 1383(c)(3). The statute expressly incorporates the standards established by 42 U.S.C. § 405(g), which

provides, in relevant part, that "[t]he findings of the Commissioner of Social Security as to any fact if supported by substantial evidence, shall be conclusive[.]" Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then the decision must be affirmed. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.") "Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

"In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991); *see also Veino*, 312 F.3d at 586 ("The district court's review of the Commissioner's decision regarding [the existence of a] disability is limited to a determination of whether the decision is supported by 'substantial evidence' in the record as a whole."). The "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This deferential ["substantial evidence"] standard of review is inapplicable . . . to the Secretary's conclusions of law" and "[f]ailure to apply the correct legal standards is grounds for reversal."). The Commissioner's legal

conclusions and compliance with applicable regulatory and statutory mandates are reviewed *de novo*.

## II. Legal Standard for Disability Determination

To qualify for either DIB or SSI, a claimant must be deemed "disabled" as the term is defined in 42 U.S.C. §§ 423(d)(1)(A) and 1382c.[4] A person is "disabled" when "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) and §1382c(a)(3)(A). A person is deemed "disabled" and eligible for benefits "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003) (quoting 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B)).

In determining whether a claimant is disabled under the Act, the Commissioner applies a five-step evaluation process. 20 C.F.R. § 404.1520. Under this five-step framework, the Social Security Administration ("SSA") must first consider the claimant's work activity. If the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment. 20 C.F.R.

---

[4] The guidelines for eligibility of DIB are codified in 42 U.S.C.A. § 423, while the guidelines for SSI are codified in § 1382.

§404.1520(a)(4)(ii). If the claimant does not have "any impairment or combination of impairments which significantly limit [his or her] physical or mental ability to do basic work activities," the claimant does not have a severe impairment and, therefore, is not disabled. 20 C.F.R. §§ 404.1520(c).

In the third step, the SSA further considers the medical severity of the impairment by comparing the claimant's impairment to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. 20 C.F.R. §§ 404.1520(d). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" to do his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv). If the claimant can still do his or her "past relevant work," the claimant is not disabled. *Id.* However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work." 20 C.F.R. §§ 404.1520(a)(4)(v). The Social Security Administration bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

The regulations require deference to the opinions of those physicians who have personally treated social security claimants. The "treating physician rule" provides that a treating source's opinion regarding the nature and severity of a claimant's impairments that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the record should be given controlling weight. 20 C.F.R. § 404.1527(d)(2). The "opinions of a treating physician . . . need not be given

16

controlling weight where they are contradicted by other substantial evidence in the record."
*Veino*, 312 F.3d at 588 (citations omitted). The less consistent an opinion is with the record as a whole, the less weight it will be given. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Since the "ultimate finding of whether a claimant is disabled and cannot work [is] reserved to the Commissioner" and the Commissioner considers "data that physicians provide but draws [her] own conclusions," a treating physician's disability assessment is not determinative. *Id.* (internal quotation marks and citation omitted); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). The regulations require, however, that if an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ "give good reasons" for doing so. 20 C.F.R. § 404.1527(d)(2). The ALJ is also required to apply the following factors in determining what weight to give to these opinions: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating source's opinion is with the record as a whole; (5) the specialization of the source in contrast to the condition being treated; and (6) any other significant factors. *See id.* After considering the above factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Before an ALJ can weigh these factors, however, the ALJ must develop the record. *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). Indeed, an "ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "In light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ

cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). "[W]here . . . an ALJ concludes that the opinions or reports rendered by a claimant's treating physicians lack objective clinical findings, she may not reject the opinion as unsupported by objective medical evidence without taking affirmative steps to develop the record in this regard." *Rivas v. Barnhart*, No. 01 Civ. 3672, 2005 U.S. Dist. LEXIS 1114, at *66-67 (S.D.N.Y. Jan. 28, 2005).

In addition, "[i]t is well settled that 'a claimant's subjective evidence of pain is entitled to great weight' where . . . it is supported by objective medical evidence." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). Where an ALJ rejects subjective testimony concerning pain, the ALJ "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987). "Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ must consider *inter alia*: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side-effects of medication taken to alleviate the pain or other symptoms; (5) any treatments, other than medication, for relief of pain or other symptoms; and (6) any other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

### III. The ALJ's Application of the Five-Step Analysis

At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity after concluding work as a babysitter on November 24, 2003, her alleged onset date. At step two, the ALJ found Plaintiff had "severe" impairments, including hypertension, tarsal coalition of the left foot, osteoarthritis, diabetes mellitus with possible neuropathy, and cervical and lumbar degenerative disc disease. At step three, the ALJ found that Plaintiff's impairments did not meet or equal the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix I. These findings are supported by substantial evidence in the record and neither party disputes these determinations. Accordingly, this Court will begin its discussion with step four of the ALJ's analysis.

The fourth step in the sequential process requires the ALJ to determine a claimant's RFC and to decide whether the claimant's RFC permits her to perform her past relevant work. The ALJ determined that prior to December 21, 2007, Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). However, the ALJ found that after December 21, 2007, Plaintiff's condition had progressed to the point that she was unable to perform work activity during an eight-hour day, five-day week and, thus, she was disabled under the Act. Plaintiff challenges the ALJ's determination that she was able to do sedentary work prior to December 21, 2007, contending that the ALJ (1) failed to follow the treating physician rule and, thus, did not properly assess Plaintiff's onset date, and (2) failed to properly evaluate Plaintiff's credibility. The Court agrees.

A. The ALJ Failed to Properly Apply the Treating Physician Rule

In determining Plaintiff's RFC prior to December 21, 2007, the ALJ did not give controlling weight to Dr. Decade's opinion concerning Plaintiff's limitations. Although it may be unclear exactly how often Plaintiff visited Dr. Decade – six to eight times per month,

according to Plaintiff's testimony, or at least once a month, according to Dr. Decade – there is no question that Dr. Decade has been Plaintiff's treating physician since April 2005. Nonetheless, the ALJ did not expressly consider the factors set forth in 20 C.F.R. § 404.1527(d)(2), but only found that Dr. Decade's opinion "was not supported by any significant neurological findings, objective testing or degrees of . . . limitation[] and [it] was based solely upon [Plaintiff's] complaints." *Id.* at 21. The Court finds the ALJ erred because (1) Plaintiff's primary care physician's opinion is supported by the medical record, (2) the ALJ failed to provide sufficient reasons for disregarding Dr. Decade's opinion and (3) the ALJ failed to secure Dr. Decade's records.

First, Dr. Decade's opinion was amply supported by clinical findings in his report and consistent with the medical record as a whole. His opinion was largely based on the fact that Plaintiff had injuries of the cervical spine, which were then under evaluation for neurosurgery, and neuropathy related to her diabetes. The spinal injuries were apparent in a February 14, 2007, MRI, which revealed significant C3-4, C4-5, and C5-6 disc degeneration with spondylosis anteriorly and posteriorly. Dr. Decade's neuropathy diagnosis was consistent with that of other physicians, who diagnosed Plaintiff with neuropathy on December 8, 2005, with polyneuropathy on February 27, 2006, and with neuropathy again on September 21, 2006.

In addition, there is no indication that the ALJ considered the 20 C.F.R. § 404.1527(d)(2) factors in deciding not to give Dr. Decade's opinion controlling weight. The ALJ did not even mention these factors, much less make any effort to apply them as required by § 404.1527(d)(2). Rather, the ALJ stated only "although the wor[d] neuropathy has been utilized in this record, [Plaintiff's] oral medication remained the same, she never was required to take insulin and there

were no laboratory tests showing th[at] glucose levels . . . were not within . . . normal limits."
*Id.* at 21.

The ALJ could not have relied on this rationale, however, because the ALJ failed to adequately develop the record. Dr. Decade's April 27, 2007, questionnaire states that he had treated Plaintiff on a monthly basis since April 2005, and Plaintiff herself estimated that she had visited Dr. Decade about twice a week. Yet, the Administrative Record contains only three documents from Dr. Decade: the April 27, 2007, questionnaire and the letters dated May 21, 2007, and June 4, 2007. Although the record indicates that Plaintiff's counsel may have provided the ALJ with Dr. Decade's records from June 7, 2006, to June 4, 2007, *id.* at 195, there is no indication that these documents are contained in the administrative record. Moreover, there is nothing to suggest that Plaintiff's counsel provided the ALJ with Dr. Decade's records from the period between April 2005 and June 7, 2006, and, although the ALJ issued multiple subpoenas to the hospitals where Plaintiff had been treated, there is no evidence she made any attempt to acquire Dr. Decade's complete medical file. Accordingly, the Court remands this matter so that the ALJ may properly develop the record and further explain her reasons for failing to give controlling weight to Dr. Decade's opinion. *See Cleveland v. Apfel*, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000) (remanding case where ALJ failed to *sua sponte* develop the record by contacting a treating physician whose opinion was not supported by objective clinical findings and instead relied on a consulting physician's assessment that plaintiff was able to work).

## B. The ALJ Did Not Give Appropriate Weight to Plaintiff's Subjective Complaints

The ALJ also erred in discounting Plaintiff's subjective claims of pain. The ALJ found that Plaintiff's allegations of pain were inconsistent with "the medical findings, especially the

negative neurological findings." However, the ALJ did not discuss those medical or neurological findings in enough detail to enable this Court to decide whether they were legitimate reasons for the ALJ's disbelief.

Contrary to the ALJ's findings, there were positive neurological findings throughout the record. Plaintiff's July 2005 NCV and EMG studies were suggestive of bilateral tarsal tunnel syndrome and her October 2006 EMG showed "denervation in multiple paraspinal muscles" consistent with polyradiculopathy in Plaintiff's lower extremities. Moreover, the February 2007 radiological studies of Plaintiff's cervical spine showed severe impingement upon the nerves. Although it is unclear precisely when that impingement began, there is no evidence that it was due to a sudden trauma. Rather, the radiologist's report indicated that it was due to degeneration. Thus, even if there had been no positive neurological findings – as the ALJ incorrectly implied – there was still ample evidence to support Plaintiff's subjective claims of pain.

## CONCLUSION

For the reasons set forth above, this Court denies the Commissioner's motion for judgment on the pleadings, grants Plaintiff's cross-motion to the extent that it seeks remand, and remands this action to the Commissioner for further development of the record and rehearing in accordance this opinion.

**SO ORDERED.**

s/Sandra L. Townes

SANDRA L. TOWNES
United States District Judge

Dated: May 28 2010
Brooklyn, New York